UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | |
|---|---|---|
| WARREN BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:21-CV-037-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| CHRISTINE WORMUTH,[1] | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion for Summary Judgment filed by Defendant Christine Wormuth, Secretary of the Department of the Army. [R. 38]. Plaintiff Warren Brown responded to the motion, and the Secretary replied. *See* [R. 42]; [R. 43]. The matter stands submitted for review. For the following reasons, the Secretary's motion will be granted.

**I.   Background**

Brown is a resident of Hardin County, Kentucky, and since 2011, he has been employed as a Training Instructor, GS-1712-09, with the 83rd Army Reserves Readiness Training Center ("USARRTC"), in Fort Knox, Kentucky. *See* [R. 14, ¶ 11]; *see also* [R. 38-1, p. 1, 20:3–13].[2] As far as education, Brown has a bachelor's degree in organizational leadership and a master's degree in leadership and human resource. *See* [R. 42-2, p. 5, 16:5–13]. Over the course of his

---

[1] Secretary Wormuth has been automatically and properly substituted as the Defendant herein. *See* Fed. R. Civ. P. 25(a)(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

[2] Excerpts of Brown's deposition appear several places in the record. *See, e.g.*, [R. 38-1]; [R. 42-2]; [R. 43-1]. The Court will cite to those transcripts at the page number of the PDF within CM/ECF, followed by the internal page number of the document, with line number, for clarity.

employment, Brown has received several awards and recognition for his work. *See* [R. 38-1, p. 22, 81:23–25]; *see also* [R. 42-2, pp. 16–21, 81:23–86:21].

Brown, who is African American, suffers from anxiety disorder/Post Traumatic Stress Disorder, which he alleges "impacts his ability to focus and causes him to worry excessively." [R. 14, ¶ 12]; *see also* [R. 38-1, p. 30, 106:7–25]; [R. 38-2, p. 2] (Declaration of Brown). He also has Spondylolisthesis of the L5 and S1 vertebrae of his spinal cord, which causes him to have a "stiff and sour back" and makes standing for long periods of time (more than an hour) painful. [R. 14, ¶ 12]; *see also* [R. 38-1, p. 23, 89:8–13]; [R. 38-1, p. 31, 107:1–3]; [R. 38-2, pp. 3–4]. In 2016, Brown provided medical documentation to management to support his reasonable accommodation request for these medical issues, and management granted his request, which remained in effect through the filing of his Amended Complaint. *See* [R. 14, ¶ 13]; *see also* [R. 38-2, pp. 3–4].

Through this action, Brown alleges that "there were other people who were white" (and not disabled) who were paid more than he was. [R. 38-1, p. 25, 94:22–25]. Specifically, Brown alleges that, although he did the work of a GS-11, he continued to be paid at the rate of a GS-9, but there were other (white, non-disabled) individuals who did the same work as he did but were classified as, and paid at the rate of, a GS-11. *See, e.g.*, [R. 38-2, p. 6] ("[T]here are some Instructors within the 83rd, who were hired as GS-9's, and now some Instructors being upgraded to GS-11 without a desk audit. There are two individuals, Kevin Lindsay and Mike Copeland who are GS-11s but doing the same as me and there was no desk audit done."); *see also* [R. 14, ¶¶ 26–28, 36].[3]

---

[3] A "desk audit" is one way individuals can have their job grade changed. *See generally* [R. 38-5] (Declaration of Tonya L. Nieves, Chief of the Transition Classification Division of the Civilian Human Resources Agency with the Department of the Army at Fort McCoy, Wisconsin, which services the 83rd USARRTC at Fort Knox) (discussing how civilian positions are "graded" and how an individual can "appeal" the grading of a position to either the Army's Civilian Personnel Advisory Center ("CPAC") or the Office of Personnel Management ("OPM")). Notably, Brown never "filed an appeal seeking a desk

To understand Brown's claims, the Court must consider his job duties. To begin, the written description of Brown's position describes the position as an instructor of soldiers and civilians, teaching a minimum of 1,000 hours per year. *See* [R. 14, ¶ 14]; *see also* [R. 38-3, pp. 11–15] (Army Position Description for "Training Instructor"). According to the position's written description, "major duties" for the position include "serv[ing] as an instructor using collective team thought and analysis[.]" [R. 38-3, p. 13]. The description lists instruction as 60 percent of the position's major duties, following the U.S. Army Training and Doctrine Command's SAT regulation, including "participat[ing] in selection of a course theme," "recommend[ing] methods of instruction," and "developing and sustaining classroom efforts," as 35 percent of the major duties, and providing logistical support, including "classroom setup, requesting and gathering course materials, requesting and receiving special training items, and acquisition/maintenance of classroom publications," as 5 percent of the major duties. *Id.* at 13–14.

During his deposition, Brown testified that, as a Training Instructor, he will "set the classroom up for instruction and make sure everything is ready to go" and "make sure the PowerPoint slides are accurate," which could include him updating the slides and sending them over to the Instructional Systems Specialists, which Brown called "ISS", to be put in a master course file. [R. 38-1, p. 2, 24:15–20]. Brown described his day-to-day duties as "train[ing] everyone on [his] team." *Id.* at 2, 24:21–22. Brown has team members of three and "ensure[s] they understand the curriculum and the timeline that [they] have to get things accomplished." *Id.* at 2, 24:21–24. Brown seeks to make sure that the people on his team are "subject matter experts." *Id.* at 13–14, 24:25–25:4.

---

audit either with Army CPAC or OPM." *Id.* at ¶ 9; *see also* [R. 38-2, p. 7] (Brown discussing how a desk audit was not done).

Brown is responsible for teaching two courses: Army Training Requirements and Resources System ("ATRRS") and Quota Management.[4] *See id.* at 13, 49:1–21; *id.* at 17, 68:20–21; *see also* [R. 38-3, p. 3, ¶ 13] ("As a GS/09 Training Instructor assigned to the AOC/QMC instructional team of the Readiness Education Directorate as part of the RTA, Mr. Brown's primary responsibility is instructing the AOC/QMC sources; specifically, the Army Training Requirements and Resources System (ATRRS) Course and the Quota Management Course."). Each course has 24 students enrolled at one time. [R. 38-1, p. 15, 65:20–22]. Brown estimates that he is teaching in a classroom between 30 and 34 weeks a year. [R. 42-2, p. 28, 121:17–20].

Brown's other duties include making sure the curriculum and "program of instructions" are updated and ensuring that all students are enrolled. [R. 38-1, p. 3, 25:11–14]. He takes attendance and sends out an alpha roster and makes sure that all students match the student roster, which he provides to school operations. *Id.* at 3, 25:14–17. He also signs off on the training schedule, which he will go over with the chief instructor. *Id.* at 3, 25:18–23; *see also* [R. 38-3, pp. 11–15].

If Brown is assigned a block of instruction, he will "give the block of instruction" and then write the PE, which allows individuals to "actually go in and physically work in ATRRS." [R. 38-1, pp. 3–4, 25:24–26:12]. Sometimes, Brown helps in school operations, and he will do troubleshooting and customer service, as well. *Id.* at 4, 26:13–15. He must also "be abreast to all the changes that come up through ATRRS." *Id.* at 5, 27:5. In addition to instructing, Brown

---

[4] ATRRS is "a repository that catches an individual's training history" and stores that information; the system "also takes the statistical data . . . of who's sitting in the seat," which affects funding. [R. 38-1, pp. 17–18, 68:20–69:9]; *see also* [R. 38-3, p. 3, ¶ 14] ("ATRRS is the system of record for management of personnel input to institutional training for the Total Army as an online repository that captures an individual's training history."). Separately, "[t]he quota manager teaches how to actually do TACITS, and that's going and looking at the UMR, which is the unit manning request, what the units need." [R. 38-1, p. 6, 28:21–24].

develops courses. *See id.* at 5, 27:11–14; *see also id.* at 19, 71:17–22 ("So what you look at is needs of the course and what the end state is, and I try to – you know, try to come up with ways of making that beneficial or fun to do, and it's kind of hard to do to pull people in.").

Brown testified that there were discrepancies between the written position description for his role and his actual work. *Id.* at 5–6, 27:22–28:14. For instance, he said that "training new instructors, writing the course, developing the course, and also doing school management," and doing two courses (as opposed to the one when he was hired) are not in the written description. *Id.* Brown described the written description (from 1998) as "fit[ing] everyone" because it was "generic for hiring." *Id.* at 6, 28:3–4; *id.* at 7, 30:7–10. Still, he testified that he did all the items on his position description. *Id.* at 7, 30:19–21.

At some point, work was done to have the position description updated, but that process was never completed. *See id.* at 8–10, 36:16–38:5; *see also* [R. 38-3, p. 3, ¶¶ 16–17] ("At various points, including in 2018, the 83rd USARRTC, and the RTA, as a whole went through efforts at an attempt to update position descriptions. As part of that process, Warren Brown and others drafted an updated position description; however, to my knowledge, no position descriptions within the RTA were ever updated as part of that process."). The draft position description that Brown created did not say whether it was for a GS-9 or GS-11 position. [R. 38-1, p. 10, 38:2–5].

Through this litigation, Brown alleges that he was discriminated against because of his race and disabilities in terms of pay beginning around 2018. *See* [R. 14]; *see also* [R. 38-1, p. 25, 94:22–25] ("Q: So in your present case are you alleging there were other people who were white that are paid more than you? A: Yes, sir."); [R. 38-2, p. 6]. During his deposition, Brown testified:

> What they did was they constructed a group of white individuals to instruct that was one hallway away from me, which they were paying them GS-11 for doing less than what I was doing. For instance, the class size, my class size is 24, their class size was 12. They taught 12 times a year and I taught 30 times a year.

[R. 38-1, p. 25, 94:15–21]. Brown names Mike Gibson, Mike Copeland, Kevin Lindsay, and a man by the last name of Love, as individuals who were similarly situated to him, but were paid at a GS-11 (as opposed to GS-9) rate. *Id.* at 26, p. 95:1–19.

According to declarations of individuals at the 83rd USARRTC that the Secretary filed in the record, Lindsay and Gibson were GS-11 Training Specialists and Copeland and Love were GS-11 Instructor Systems Specialists. [R. 38-4, pp. 1–2, ¶ 7] (Declaration of Norman E. English, Director of Training Development under the 83rd USARRTC). Importantly, these positions were within the Staff and Faculty Development Division, and more specifically within the Directorate of Training and Development, which was a different directorate than the one in which Brown has worked since 2011. *See id.* at ¶ 8; *see also* [R. 38-3, pp. 1–2, ¶¶ 5–11] (Declaration of Jonathan S. Scholl, the Deputy Commandant of the Readiness Training Academy as part of the 83rd USARRTC) (discussing organizational structure and chain of command for the 83rd USARRTC). Thus, each of these men, to quote the Secretary, worked "under different supervisors in a different department" than Brown. [R. 38, p. 1]. The Secretary represents that the GS-11s are primarily course managers, not instructors. [R. 43, p. 2].

Further, according to Scholl's declaration, "Lindsay and Gibson were competitively selected for GS-11 Training Specialist positions," and "[t]hey were not in GS-9 positions that were then upgraded to GS-11 Training Specialist positions." [R. 38-3, p. 3, ¶ 19]. Similarly, according to English's declaration, "Mr. Copeland and Mr. Love were competitively hired or promoted into their positions as GS-11s," and "[t]he positions themselves were not upgraded from GS-9 (or any other grade) to GS-11 positions." [R. 38-4, p. 2, ¶ 9]. Notably, the written position descriptions for the GS-11 positions, which have been filed in the record, show different job responsibilities, duties, and requirements for the GS-11 positions as compared to Brown's GS-9 position, including

how much time is to be spent on instruction. *Compare* [R. 38-4, pp. 3–15] (Training Specialist and Instructor Systems Specialist Position Descriptions), *with* [R. 38-3, pp. 11–15] (Training Instructor Position Description).

In his deposition, Brown described Love as a "1750 ISS," who works in staff and faculty as an instructor (even though he is not an instructor). [R. 38-1, p. 26, 95:21–24]. Brown similarly described Copeland as a "1750," who was moved "to staff and faculty where he was supposed to be in ISS to supposedly update the course, but they don't update a course that belongs to the Army. So he was instructing, not in ISS as 1750." *Id.* at 27, 96:1–7. According to Brown, Lindsay "worked at staff and faculty as an instructor," sometimes right next door to Brown. *Id.* at 27, 96:9–11. Brown said Gibson also worked in staff and faculty. *Id.* at 27, 96:12–16. By contrast, Brown was in the Readiness Training Academy division. *See id.* at 51–52, 166:25–167:1; *see also* [R. 38-4, p. 2, ¶ 8] ("The GS-11 Training Specialist or Instructor Systems Specialists positions held, or once held, by Lindsay, Gibson, Copeland and Love are within the []Staff and Faculty Development Division (SFDD), more specifically within the Directorate of Training and Development (DOTD) within the US Army Reserve Readiness Training Command (USARRTC). This is a different directorate than the one in which Warren Brown has worked since 2011.").

Brown testified that he thought of the other men as "instructors" because they were doing "the same thing" that he was, [R. 38-1, pp. 27–28, 96:25–97:3], and that he had observed the men "standing in front of the classroom and instructing, talking to the students as an instructor." *Id.* at 28, 97:17–19. He also testified that he "[v]ery rarely" watched the men, but he knew their pictures because "they posted all the instructors' pictures outside a wall of a classroom" and that they worked in the same building as he does. *Id.* at 28, 97:11–14; *see id.* at 41, 123:16–18. Brown described the other men as teaching specialized knowledge about Army functions: "They teach

about how to present classes, and in order to present a class, their class is a prerequisite to instruction, how to instruct." *Id.* at 39–40, 116:25–117:7. Brown said his classes are prerequisites to "getting a login ID." *Id.* at 40, 117:12–13.

Still, Brown admitted that he did not know any of the men's job titles, *id.* at 27, 96:23–24, that he did not know how many days a week or weeks in a year they teach, *id.* at 28, 97:20–22, and that he did not know what the men did outside of the classroom, *id.* at 28, 97:23–25; *see id.* at 41, 123:6–15. Additionally, Brown was generally unable to offer specifics of when the men were hired in as GS-11s and by whom they were hired. *Id.* at 51–53, 166:10–168:13 (discussing timing and hiring of the other men).

Further, Brown acknowledged that the other men's positions had different duties. For instance, he testified that, unlike him, the other men do not do Critical Site Selection Boards ("CSSB"), "train other instructors on their team to do the same thing as they do," or develop and write their course(s) (because they have to follow what the Army specifies). *Id.* at 33–34, 110:24–111:18; *see also id.* at 35–36, 112:23–113:3. Brown said the men teach smaller class sizes and that he had more classes. *Id.* at 34, 111:22–24. But Brown acknowledged recent changes meant the other men had larger loads and that only Gibson and Love remained in their respective positions. *Id.* at 34–35, 111:25–112:14. Brown also acknowledged that the men used different curriculum and taught courses that involved different systems and goals. *Id.* at 38–39, 115:10–116:17.

Brown filed the instant action on January 20, 2021. [R. 1]. After some delay regarding service, the Secretary filed a motion to dismiss in November 2021, *see* [R. 13], which prompted Brown to file an Amended Complaint, *see* [R. 14]. That Amended Complaint is the controlling pleading in this action, and in it, Brown brings a claim under Title VII of the Civil Rights Act for

racial discrimination and a claim under the Rehabilitation Act of 1973 for disability discrimination. *See id.* In December 2021, the Secretary filed a motion to dismiss the Amended Complaint, *see* [R. 17], which was denied, *see* [R. 22]. The parties then proceeded to engage in discovery, and the Secretary filed the present motion for summary judgment on November 2, 2023. [R. 38]. The motion has been fully briefed and stands submitted for review. *See* [R. 42]; [R. 43].

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). The Court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The initial burden of establishing that no genuine dispute of material fact exists rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324. When, as here, the defendant moves for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Where "a party fails to support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat the fact as undisputed. Fed. R. Civ. P. 56(e)(2). A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

### III. Analysis

Through his Amended Complaint, Brown claims that he was discriminated against in terms of pay based on his race (in violation of Title VII) and based on his disabilities (in violation of the Rehabilitation Act). Because the showings under each claim are similar, the Court will consider them together. *See generally Santiago v. Meyer Tool Inc.*, No. 22-3800, 2023 WL 3886405, at *4 (6th Cir. June 8, 2023) ("Because we apply the same analysis after the prima facie showing, and because Santiago generally discusses the facts without specific application to the individual legal claims, we address these claims together."); *Harrison-Pepper v. Miami Univ.*, 246 F. Supp. 2d 854, 859 (S.D. Ohio 2003), *aff'd*, 103 F. App'x 596 (6th Cir. 2004) ("While Plaintiff has asserted two different forms of discrimination against Defendant, her claims are clearly intertwined. She argues, for example, that her salary has been suppressed because of her sex and because of unfair consideration of the effects of accommodations for her handicap."). For the reasons that will be explained below, the Secretary is entitled to summary judgment on both of Brown's claims.

Brown is a federal employee, and his Title VII claim is brought pursuant to 42 U.S.C. § 2000e–16. That statute states in relevant part that "[a]ll personnel actions affecting employees or

applicants" for certain federal positions "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16. In interpreting this statute, courts often look to cases involving 42 U.S.C. § 2000e–2. *See Phillips v. Cohen*, 400 F.3d 388, 397 (6th Cir. 2005) (explaining that 42 U.S.C. § 2000e–16 makes the "core discrimination standard" of § 2000e–2 "applicable to certain federal employees"). Relatedly, "[t]he Rehabilitation Act, not the Americans with Disabilities Act (ADA), constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007); *see also Bent-Crumbley v. Brennan*, 799 F. App'x 342, 344 (6th Cir. 2020) (citing *Jones*, 488 F.3d at 403) (explaining that the Rehabilitation Act is the "exclusive remedy for a federal employee alleging disability-based discrimination").

A Title VII claim can be based on direct or indirect (*i.e.*, circumstantial) evidence. *See Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019) ("A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03 (1973)."); *see also McDonnell Douglas,* 411 U.S. 792, *as subsequently modified by Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248 (1981). A Rehabilitation Act claim can likewise be based on either direct or indirect evidence. *See Bledsoe v. Tenn. Valley Auth. Bd. of Directors*, 42 F.4th 568, 578 (6th Cir. 2022) ("The Rehabilitation Act forbids discrimination based on disability, and a plaintiff may prove a Rehabilitation Act violation through direct or indirect evidence.").

As a preliminary matter, Brown has not pointed to any *direct* evidence of discrimination in this case. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 n.5 (6th Cir. 2008) (explaining that direct evidence of discrimination is "that evidence which, if believed, requires the conclusion

that unlawful discrimination was at least a motivating factor in the employer's actions," and that circumstantial evidence, "on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred") (cleaned up); *Bledsoe*, 42 F.4th at 580–81 ("Direct evidence is evidence that proves the existence of a fact without requiring any inferences.  The evidence, on its own, must lead a reasonable juror to conclude that a decisionmaker was biased, and that adverse animus motivated the adverse action.") (cleaned up).  For example, Brown does not highlight any comments or documentation that references his pay being different based on his race or disabilities.  *Cf. Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 650 (6th Cir. 2012) ("Ondricko asserts she presented direct evidence of race discrimination based on O'Connor's statement to Hannon: '[D]o you think I wanted to fire Kim, I didn't want to fire Kim, how can I keep the white girl.'").  Therefore, the Court views Brown as relying on circumstantial evidence, which means the *McDonnell Douglas* burden-shifting framework applies to his claims.  *See Harris v. City of Akron*, 836 F. App'x 415, 418 (6th Cir. 2020) ("When a plaintiff uses circumstantial evidence to show discrimination, courts apply the *McDonnell Douglas / Burdine* framework."); *Bledsoe*, 42 F.4th at 581 ("When a plaintiff presents indirect evidence in support of an ADEA or a Rehabilitation Act claim, the *McDonnell Douglas* burden-shifting framework governs."); *see also Hobson v. Austin*, No. 3:17-1485, 2021 WL 602874, at *5 (M.D. Tenn. Feb. 15, 2021), *report and recommendation adopted*, No. 3:17-CV-01485, 2021 WL 973481 (M.D. Tenn. Mar. 16, 2021) (applying *McDonnell Douglas/Burdine* standard to federal employee's claims, including one brought under Title VII).

For a Title VII claim, the framework requires a plaintiff to first establish a prima facie case by showing that: "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by

someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (internal quotation marks omitted); *see also Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021) (quoting *Wright*, 455 F.3d at 707, in context of pay discrimination Title VII claim); *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004) (discussing one way to approach fourth element as considering whether "similarly situated non-protected employees were treated more favorably").

"The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions, supported by admissible evidence that if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Briggs*, 11 F.4th at 508 (cleaned up). "Finally, the employee has the burden of proving by a preponderance of the evidence that the employer's proffered reasons were a mere pretext for discrimination." *Id.* at 508–09. "When the burden shifts back to the plaintiff, he must come forward with evidence that the defendant's reason for the employment action is false, but he need not present independent evidence that the proffered reason is pretext for discrimination." *Id.* at 509 (cleaned up). "The employer bears the burden of production at the second step, but the employee bears the ultimate burden of production and persuasion." *Id.*; *see also Vargas v. Bd. of Metro. Park Dist. of the Toledo Area*, No. 3:21-CV-1551, 2024 WL 581251, at *5 (N.D. Ohio Feb. 13, 2024) (applying *Briggs* in Title VII claim based on termination of employment).

Similarly, to establish a prima facia case under the Rehabilitation Act, "a plaintiff must show (1) that he is disabled, (2) that he is otherwise qualified for the job, with or without reasonable accommodation, (3) that he suffered an adverse employment action, (4) that his employer knew or had reason to know of his disability, and (5) that, following the adverse employment action, either

he was replaced by a nondisabled person or his position remained open."[5] *Bledsoe*, 42 F.4th at 578 (internal quotation marks omitted). "The final element may also be satisfied by showing that similarly situated non-protected employees were treated more favorably." *Jones*, 488 F.3d at 404. Again, under this framework, "if a plaintiff presents sufficient evidence of a prima facie case of discrimination, an employer must offer a nondiscriminatory reason for the adverse action." *Bledsoe*, 42 F.4th at 581. "The plaintiff then must demonstrate that the employer's reason is a pretext for discrimination." *Id.*

For both claims, a plaintiff may demonstrate pretext in several ways. As the Sixth Circuit has explained:

> A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.

*White*, 533 F.3d at 393 (cleaned up); *see also Bledsoe*, 42 F.4th at 581 ("To demonstrate pretext, Bledsoe must show that the ethical concerns '(1) had no basis in fact; (2) did not actually motivate the adverse action; or (3) w[ere] insufficient to warrant' the demotion.").

In this case, the Secretary argues that Brown has not demonstrated a genuine dispute of material fact as to the fourth element of his Title VII claim and the fifth element of his Rehabilitation Act claim. The Court will refer to these elements as the "comparator elements."

---

[5] Recent Sixth Circuit case law discusses the different causation standards that apply under certain sections of the Rehabilitation Act. *See Bledsoe*, 42 F.4th at 578–81. However, the Court need not explore the distinctions regarding causation in this case because, as will be discussed below, Brown has failed to show his disability played any role regarding his pay. *See id.* (outlining prima facie case for Rehabilitation Act claim before discussing different causation standards).

*See* [R. 22, p. 9 n.4].[6] In this litigation, Brown claims that he was paid less than white, non-disabled individuals who were classified as GS-11s, while he did the work of a GS-11 but was compensated only as a GS-9. *See id.* at 10 ("In other words, the adverse employment action alleged by Brown is not a failure to promote, but rather, a disparity in compensation, or wage discrimination."); *see also* [R. 38-1, p. 32, 109:16–17] ("[M]y duties that I'm doing is as a GS-11 but I'm being compensated as a GS-9.")[7]

As the Court explained before, *see* [R. 22, pp. 15–16], a plaintiff claiming pay discrimination "must claim that [he] performed a job that required substantially equal skill and effort, but was paid less than similarly situated employees" outside of his protected class. *See Bridgeman v. City of Bedford Heights*, No. 1:18-cv-2481, 2019 WL 1469381, at *6 (N.D. Ohio Apr. 3, 2019) (discussing Equal Pay Act and Title VII claims); *see also Conti v. Universal Enters.*,

---

[6] The Secretary also argues that Brown cannot meet the first element of his Rehabilitation Act claim: that he was disabled. *See* [R. 38, p. 14]; [R. 43, pp. 4–6]. As will be explained below, Brown has failed to provide evidence upon which a jury could find in his favor on the comparator elements of his claims. Therefore, the Court will assume that Brown meets the first element of the prima facie case for his disability discrimination claim (based on his anxiety, PTSD, and Spondylolisthesis) for purposes of its analysis.

[7] In this action, Brown bases his claims on a theory of pay discrimination, not any failure-to-promote theory. [R. 22, pp. 9–10]; *see also* [R. 43, p. 3] (Brown's response to motion for summary judgment) ("However, there is no failure to promote claim in this suit as Brown himself admitted at his deposition and this Court has already held. Rather, the only claim before the Court is a disparate pay claim.") (internal citations omitted); [R. 19, pp. 5–6] ("Brown did not bring a claim for failure to promote, but rather for his disparate and discriminatory compensation in light of the GS-11 duties he was routinely performing, which is a qualified adverse employment action."). The Court will therefore give little attention to any argument by Brown that he was denied a promotion, as that is not the theory upon which his current claims proceed. *See, e.g.*, [R. 42, pp. 1–2] ("As will be detailed below, Brown can establish both of his claims and there are issues of material fact over whether Defendant's stated reasons for not promoting Brown to the GS-11 level are pretext for race discrimination and disability discrimination. As such, Defendant's Motion for Summary Judgment should be denied."); *cf.* [R. 38-2, p. 7] (Brown stating that he had been discouraged from applying for other positions because of the view that they were fast-paced and that he could not keep up). In 2015, Brown settled a separate EEO complaint based on a non-selection to a GS-11 position, but those circumstances are not at issue in this case. *See generally* [R. 38-6] (settlement agreement). Further, Brown admitted that he was at "fault" for not following through on any reclassification efforts. *See, e.g.*, [R. 38-2, p. 7] ("Q. According to the record, in the Counselors Report, you allege a classification desk audit was performed on your position sometime in 2018 and determined you were performing at a higher level? If so, by whom? A. No that's not correct. I don't know if they did one or not but I turned the paperwork in to MAJ Usoroh before he PCS'ed. But it wasn't and that is my fault.").

50 F. App'x 690, 698 (6th Cir. 2002) ("A claim of disparate pay for equal work is essentially the same whether pursued under Title VII or the Equal Pay Act."). Stated another way, the plaintiff must ordinarily show that the employer paid different wages to employees of different classes for substantially equal work. *Conti*, 50 F. App'x at 698.

To determine if a non-protected employee is similarly situated to the plaintiff, the Court must evaluate "the relevant factors" of "skill, effort, and responsibilities of each job and the working conditions under which each job is performed." *Conti*, 50 F. App'x at 699; *see also Moore v. Univ. of Memphis*, No. 10-2933-AJT-TMP, 2013 WL 6550434, at *13 (W.D. Tenn. Aug. 16, 2013), *report and recommendation adopted*, No. 10-2933, 2013 WL 6538391 (W.D. Tenn. Dec. 13, 2013).[8] However, even at the summary judgment stage, "[p]recise equivalence is not required. Rather, there need be 'only substantial equality of skill, effort, responsibility, and working conditions.'" *Conti*, 50 F. App'x at 696 (quoting *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981), in discussion of Equal Pay Act claim).

In this case, Brown offers four individuals as comparators: Lindsay, Gibson, Copeland, and Love. However, upon review of this record, the Court finds that Brown has failed to show that these men were similarly situated to him based on the skill, effort, and responsibilities of their jobs and working conditions. First, each of the other men were in a different division and reported to a different chain of command than Brown. *See* [R. 38-4, p. 2, ¶ 8] ("The GS-11 Training Specialist or Instructor Systems Specialists positions held, or once held, by Lindsay, Gibson,

---

[8] In a disciplinary context, case law directs that, to be similarly situated, "the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating or mitigating circumstances which would distinguish their conduct or the employer's treatment of them for that conduct." *Conti*, 50 F. App'x at 699. But the Sixth Circuit has found that "[t]hese factors have little, if any, relevance to the inquiry of whether employees are similarly-situated for purposes of resolving a gender-based wage discrimination claim under Title VII." *Id.* Although this case involves a race-based wage discrimination claim under Title VII, the Court still follows the *Conti* standard.

Copeland and Love are within the []Staff and Faculty Development Division (SFDD), more specifically within the Directorate of Training and Development (DOTD) within the US Army Reserve Readiness Training Command (USARRTC). This is a different directorate than the one in which Warren Brown has worked since 2011."); *see also* [R. 38-3, pp. 1–2, ¶¶ 5–11] (discussing organizational structure and chain of command for the 83rd USARRTC); [R. 38-3, pp. 5–10] (organizational charts).

Second, although Brown described his subjective impressions that the men were "instructors," he admitted that he did not know any of the men's job titles, [R. 38-1, p. 27, 96:23–24], that he did not know how many days a week or weeks in a year they teach, *id.* at 28, 97:20–22, and that he did not know what the men did outside of the classroom, *id.* at 28, 97:23–25; *see also id.* at 41, 123:6–15. Brown was also generally unable to offer specifics of when the men were hired in as GS-11s and by whom they were hired. *Id.* at 51–53, 166:10–168:13 (discussing timing and hiring of the other men). Further, according to Scholl's declaration, "Lindsay and Gibson were competitively selected for GS-11 Training Specialist positions," and "[t]hey were not in GS-9 positions that were then upgraded to GS-11 Training Specialist positions." [R. 38-3, p. 3, ¶ 19]. Similarly, according to English's declaration, "Mr. Copeland and Mr. Love were competitively hired or promoted into their positions as GS-11s," and "[t]he positions themselves were not upgraded from GS-9 (or any other grade) to GS-11 positions." [R. 38-4, p. 2, ¶ 9].

Third, Brown acknowledged that the other men's positions involved duties that were different than his. *See* [R. 38-1, pp. 33–34, 110:24–111:18]; *see also id.* at 35–36, 112:23–113:3. Indeed, Brown acknowledged that the other men taught "about how to present classes," meaning "their class [was] a prerequisite to instruction, how to instruct," while Brown's class is a prerequisite to "getting a login ID." *Id.* at 40, 117:5–17. Moreover, the written position

descriptions for the GS-11 positions show different job responsibilities, duties, and requirements as compared to Brown's GS-9 position. *Compare* [R. 38-4, pp. 3–15] (Training Specialist and Instructor Systems Specialist Position Descriptions), *with* [R. 38-3, pp. 11–15] (Training Instructor Position Description). For example, instruction comprises only 15 percent of the Training Specialist position's major duties, and the Instructional Systems Specialist position's written description does not list instruction as one of its four major duties. *See* [R. 38-4, pp. 3–15] (Training Specialist and Instructor Systems Specialist Position Descriptions). By comparison, the Training Instructor position's written description lists instruction as 60 percent of the major duties. [R. 38-3, pp. 11–15] (Training Instructor Position Description). These distinctions support the Secretary's characterization of the GS-11s as being primarily course managers, not instructors. [R. 43, p. 2].

On such a record, Brown has wholly failed to provide evidence on which a reasonable juror could find the other men were "similarly situated" in terms of skill, effort, responsibility, and working conditions. *See Santiago*, 2023 WL 3886405, at *8 ("But despite this assertion, we cannot simply take Santiago's word for it; she offers no evidence about the respective skill, effort, and responsibility possessed by the male comparators she names. Evidence that the higher-paid male employees were also classified as machinists or that they have been employed at Meyer Tool for less time than Santiago does not adequately speak to their job requirements and duties, and leaves the court with insufficient information to conduct meaningful comparison."); *Amos v. McNairy Cnty.,* 622 F. App'x 529, 535 (6th Cir. 2015) ("Amos fails to present additional evidence regarding wage discrepancies between employees in the protected class and those outside the protected class from which a reasonable jury could conclude that defendants engaged in wage discrimination in violation of Title VII."); *cf. Harrison-Pepper*, 246 F. Supp. 2d at 861 (granting summary judgment

to defendant on Equal Pay Act, Title VII, and Rehabilitation Act claims and explaining relevant evidence: "[f]or example, the record is devoid of evidence relating to the work Hays Cummins performs as director of the Center for Science Discovery or the work Plaintiff performs in connection with the Western Performance Group").

To be sure, the record in this case is unlike those where courts have permitted similar claims to proceed because the plaintiff had presented sufficient evidence on the comparator element. *See, e.g.*, *Moore*, 2013 WL 6550434, at *14. For instance, in *Moore*, the plaintiff presented evidence regarding "professors of the same rank teaching the same subject within the School of Accountancy," which led the court to view the positions of the plaintiff and the two other professors as "presumably requir[ing] similar skills, effort, responsibilities, and working conditions." *Id.* By contrast in this case, as discussed above, the comparators Brown asserts were in a different division and reported to a different chain of command than Brown. *See* [R. 38-4, p. 2, ¶ 8]; [R. 38-3, pp. 1–2, ¶¶ 5–11]. Moreover, Brown admits he does not know any of the men's job titles, [R. 38-1, p. 27, 96:23–24], that he did not know how many days a week or weeks in a year they teach, *id.* at 28, 97:20–22, and that he did not know what the men did outside of the classroom, *id.* at 28, 97:23–25; *see also id.* at 41, 123:6–15.

By failing to identify comparators, Brown cannot satisfy the prima facie case of either of his discrimination claims. *See, e.g.*, *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (in relevant part, applying *Conti* standard to age-based wage discrimination claim and finding individuals not similarly situated when the men "performed different roles in the company"). And because the only arguments Brown makes regarding pretext are the same ones he puts forward regarding the comparator elements, he also cannot show pretext. *See* [R. 42, p. 14] (in arguments regarding pretext, "Brown incorporates his response from section III.B.2 of his

brief, discussing the similarities in roles between Brown's GS-09 role compared to the GS-11 roles held by Lindsay, Gibson, Copeland, and Love"); *see also Bledsoe*, 42 F.4th at 586 ("A plaintiff offering comparator evidence to demonstrate pretext must show that the comparator is similar in 'all relevant respects.'"). In other words, Brown has offered no evidence upon which a reasonable juror could find that the reasons proffered by the Secretary for his pay remaining at a GS-09 level, *see, e.g.* [R. 43, p. 11] ("Brown's position is graded as a GS-9 under the federal government classification system while his comparators who hold different positions in different departments with different duties have positions that are classified as GS-11s under the same classification system"), had no basis in fact, were not the actual reason, or were insufficient to explain the employer's action. The Secretary's motion for summary judgment will be granted.

### IV. Conclusion

For the foregoing reasons, and with the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. The Secretary's Motion for Summary Judgment **[R. 38]** is **GRANTED**.

2. A separate judgment shall issue.

This the 28th day of June, 2024.

*Claria Horn Boom*
CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY